## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| LFL, LTD. and | ) | Case No. 10-38333 |
| V & M ASSOCIATES, CORPORATION, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Hon. Pamela S. Hollis |

## NOTICE OF MOTION

TO:  Attached Service List

**PLEASE TAKE  NOTICE** that on Thursday, the 29th day of September, 2011, at the hour of 10:00 a.m., we shall appear before the Honorable Pamela S. Hollis, United States Bankruptcy Judge for the Northern District of Illinois, or any Judge sitting in her place and stead, in courtroom 644 of the United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, and then and there present the **MOTION OF ADELMAN & GETTLEMAN, LTD. FOR ALLOWANCE AND PARTIAL PAYMENT OF FINAL COMPENSATION AND EXPENSES AS COUNSEL TO LFL, LTD. AND V & M ASSOCIATES, CORPORATION, DEBTORS IN POSSESSION**, a copy of which is attached hereto and hereby served upon you.

> HOWARD L. ADELMAN, ESQ. (ARDC# 0015458)
> HENRY B. MERENS, ESQ. (ARDC# 6181695)
> ERICH S. BUCK, ESQ. (ARDC# 6274635)
> ADELMAN & GETTLEMAN, LTD.
> 53 West Jackson Boulevard, Suite 1050
> Chicago, Illinois 60604

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of this Notice of Motion and the Motion referred to herein have been served upon the persons listed on the attached service list as indicated on the 13th day of September, 2011.

> ___/s/ Erich S. Buck_____
> Erich S. Buck, Esq.

90582.2 9/13/11

# SERVICE LIST

**VIA ECF**

William T. Neary, Esq.
Office of the United States Trustee
Dirksen Federal Court House
219 South Dearborn Street, Suite 873
Chicago, IL 60604
Fax: (312) 886-5794
Email: USTPRegion11.ES.ECF@usdoj.gov

Libertyville Bank & Trust
c/o Jonathan P. Friedland, Esq.
Levenfeld Pearlstein, LLC
2 N. LaSalle St., Suite 1300
Chicago, IL 60602
Fax: 312-346-8434
E-Mail: Jfriedland@lplegal.com

Scott N. Schreiber, Esq.
Stahl Cowen Crowley Addis, LLC
55 West Monroe, Suite 1200
Chicago, IL 60603
Fax: 312-423-8189
E-Mail: sschreiber@stahlcowen.com

Christopher B. Lega, Esq.
Johnson Legal Group, LLC
39 S. LaSalle Street
Suite 820
Chicago, IL 60603
E-Mail: clega@jnlegal.net

**VIA E-MAIL & FIRST CLASS MAIL**

Citibank, N.A.
c/o Daniel Olswang, Esq.
Hauselman, Rappin & Olswang, Ltd.
39 S. LaSalle Street, Suite 1105
Chicago, IL 60603
Fax: 312-372-0404

**VIA FIRST CLASS MAIL**

Allied Waste
13701 South Kostner
Crestwood, IL 60445

Arion II
1265 Montgomery Road
Deerfield, IL 60015

AT&T
Attn: Bankruptcy
P.O. Box 769
Arlington, TX 76004

Akzo Nobel Paints LLC
21033 Network Place
Chicago, IL 60673-1210

Chicago Title Land Trust Company
171 N. Clark Street, Suite 575
Chicago, IL 60601

Commonwealth Edison Company
Attn: Erin Buechler
Asst. Claims & Collection Counsel
Three Lincoln Center
Oak Brook Terrace, IL 60181

Home Depot Supply
P.O. Box 509058
San Diego, CA 92150

Illinois Department of Revenue
100 W. Randolph
Bankruptcy Section-Level 7-425
Chicago, IL 60601

Internal Revenue Service
Attn: STOP 5010-CHI
230 S. Dearborn
Chicago, IL 60604

91847.1  9/12/11

L&L Appliance Mart, Inc.
3240 W. Lawrence Avenue
Chicago, IL 60625

Law Offices of Alexander Gruzmark
1701 East Lake Avenue, #200
Glenview, IL 60025

M. Gingerich, Gereaux & Assoc.
25620 Gougar Road
Manhattan, IL 60442

Nicor
Legal Department
1844 Ferry Road
Naperville, 60563-9600

Rent.com
Payment Center
Department 1987
Los Angeles, CA 90084-1987

State of Illinois Fire Marshall
1035 Stevenson Drive
Springfield, IL 62703

Worsek & Vihon LLP
180 N. LaSalle Street
Suite 3010
Chicago, IL 60601

LaMarCo Systems, Inc.
475 Lindberg Lane
Northbrook, IL 60062

Terminix Commercial
655 W. Grand Avenue #150
Elmhurst, IL 60126

Terminix Commercial
Commercial Division Management
860 Ridge Lake Boulevard
Memphis, TX 38120

Family Pride Laundries
300 W. North Avenue
Lombard, IL 60148

Integrys Energy Services, Inc.
500 West Madison Street
Suite 3300
Chicago, IL 60661

Comcast
Legal Demands Center - Data
650 Centerton Road
Moorestown, NJ 08057

Comcast
Legal Demands Center - Voice and Video
5800 S. Quebec Street
Greenwood Village, CO 80111

City of Blue Island
Water and Sewer Department
13051 S. Greenwood
Blue Island, IL 60406
Attn: Terry Sullivan

Rosanna Gilliam
c/o Charles P. Romaker
134 N. LaSalle Street, Suite 840
Chicago, IL 60602

Territory Manager
Insolvency Territory 7
Internal Revenue Service
Mail Stop 5010 CHI
230 S. Dearborn Street
Chicago, IL 60604

AM Realty Group, LLC
AM Realty Management, Inc.
c/o Alex Loyfman, Registered Agent
4117 W. Oakton Street
Skokie, IL 60076

91847.1  9/12/11

LFL, Ltd.
V & M Associates, Corporation
c/o Alex Loyfman, President
4117 W. Oakton Street
Skokie, IL 60076

George's Towing
c/o Patricia A. Twardosz, Registered Agent
1433 E. 142nd Street
Dolton, IL 60419

Family Pride Laundries
c/o Gordon S. Hughes, Registered Agent
300 W. North Avenue
Lombard, IL 60148

Allied Waste Services of Momence
c/o CT Corporation System
Registered Agent
208 S. LaSalle Street, Suite 814
Chicago, IL 60604

Terminix Commercial
c/o CT Corporation System
Registered Agent
208 S. LaSalle Street, Suite 814
Chicago, IL 60604

LaMarCo Systems, Inc.
c/o David J. Morris, Registered Agent
200 W. Madison Street, #3000
Chicago, IL 60606

Integrys Energy Services, Inc.
c/o CT Corporation System
Registered Agent
208 S. LaSalle Street, Suite 814
Chicago, IL 60604

Comcast ABB Network Solutions, Inc.
c/o CT Corporation System
Registered Agent
208 S. LaSalle Street, Suite 814
Chicago, IL 60604

Comcast Cable Holdings, LLC
c/o CT Corporation System
Registered Agent
208 S. LaSalle Street, Suite 814
Chicago, IL 60604

Comcast of Northern Illinois, Inc.
c/o CT Corporation System
Registered Agent
208 S. LaSalle Street, Suite 814
Chicago, IL 60604

91847.1  9/12/11

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     HISTORY OF THE CHAPTER 11 CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    LEGAL SERVICES RENDERED BY MOVANT . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        A.      Administrative Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        B.      Cash Collateral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        C.      Asset Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
                Initial Sale Efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
                Sale Negotiations with Kinzie . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
                The Bidding Procedures, Auction and Sale Order . . . . . . . . . . . . . . . . 21
                Pre-Closing Hurdles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
                The Debtors' Motions to Reject and to Assume and Assign . . . . . . . . . 25
                Consummation of the Kinzie Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IV.     STANDARDS FOR REVIEW OF MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        A.      Form of Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
                Itemized Daily Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
                Telephone Conferences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
                Meetings and Office Conferences . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
                Drafting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
                Legal Research . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
                Minimum Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
                Lumping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

V.      BILLING JUDGMENT AND AVOIDANCE OF DUPLICATION OF SERVICES . . . 31
        A.      Individual Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        B.      Court Appearances and Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        C.      Appropriate Level of Skill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        D.      Legal Research . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        E.      Document Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

VI.     QUALIFICATIONS OF MOVANT; PRECLUSION OF EMPLOYMENT DUE TO
        ACCEPTANCE OF THESE CASES; AND COST OF COMPARABLE SERVICES . 34

VII.    MOVANT'S STATEMENT PURSUANT TO §§ 329 AND 504 OF THE CODE AND
        BANKRUPTCY RULE 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

VIII.   NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

IX.     CONCLUSION AND REQUEST FOR ALLOWANCE AND PAYMENT OF FINAL
        COMPENSATION AND REIMBURSEMENT OF EXPENSES . . . . . . . . . . . . . . . . 40

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| LFL, LTD. and | ) | Case No. 10-38333 |
| V & M ASSOCIATES, CORPORATION, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Hon. Pamela S. Hollis |
| | ) | |
| | ) | **Hearing Date and Time** |
| | ) | **September 29, 2011 at 10:00 a.m.** |

**MOTION OF ADELMAN & GETTLEMAN, LTD. FOR ALLOWANCE AND PARTIAL
PAYMENT OF FINAL COMPENSATION AND EXPENSES AS COUNSEL TO
LFL, LTD. AND V & M ASSOCIATES, CORPORATION, DEBTORS IN POSSESSION**

Now comes Howard L. Adelman, Henry B. Merens and Erich S. Buck on behalf of

Adelman & Gettleman, Ltd. ("**Movant**"), counsel to LFL, Ltd., an Illinois corporation ("**LFL**"),

and V & M Associates, Corporation, an Illinois corporation ("**V & M**"), debtors and debtors in

possession herein (collectively, the "**Debtors**"), and for its motion (the "**Motion**") for the

allowance and partial payment of final compensation and ordinary and necessary expenses

incurred in connection therewith as counsel to the Debtors, pursuant to Section 330 of the

Bankruptcy Code (the "**Code**") and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), and in support thereof, respectfully states as follows:

I.      **INTRODUCTION**[1]

This Motion covers the approximately eleven-month period from August 27, 2010, the

date on which the Debtors voluntarily commenced their Chapter 11 Cases, through July 31, 2011

---

[1] Capitalized terms not otherwise defined in this Introduction are defined in later sections of this
Motion.

91545.5 9/13/11

(the "**Fee Period**").  Pursuant to that certain *Order Establishing Procedures for the Payment of Interim Compensation and Reimbursement of Expenses of Professionals* entered on October 28, 2010 [Docket No. 85] (the "**Interim Compensation Order**"), all Court-appointed professionals in the Chapter 11 Cases, including Movant, are entitled to seek the allowance of interim compensation and reimbursement of expenses every sixty (60) days by application therefor.  In addition, the Interim Compensation Order provides that the initial application for interim compensation credit any prepayments received from the Debtors.  However, in view of the prior lack of available funds in the Debtors' estates, until recently, Movant elected to forego any interim requests for compensation and instead hereby presents its first and final request for allowance and partial payment of fees and expenses herein.

In total, as reflected below, Movant expended over 794.60 hours of professional legal services during the Fee Period.  Movant requests allowance of final compensation in the amount of $227,099.00 and reimbursement of ordinary and necessary expenses incurred in connection therewith in the amount of $5,075.65.[2]  Movant seeks authority to apply $100,000 in Sales Proceeds on deposit in Movant's client-fund account against such allowed fees and expenses.  Movant further seeks authority to apply the Remaining Prepayment of $22,591[3] to the allowed final compensation for the Fee Period.

Movant submits that the efforts put forth and the results achieved in the Chapter 11 Cases

---

[2] Movant has voluntarily reduced the final compensation for which it seeks allowance, as explained in Sections III and VI below.

[3] Movant previously applied $27,175.00 in pre-petition fees and $234.00 in pre-petition expenses against a prepayment of $50,000.00 (the "**Prepayment**"), leaving a remaining prepayment of $22,591.00 as of the Petition Date (the "**Remaining Prepayment**").

amply support the allowance and payment of the requested compensation. Movant has acted as consultant, negotiator, arbitrator, analyst, draftsman and legal advisor. Movant has guided (and continues to guide) the Debtors through numerous issues in the Chapter 11 Cases. As more fully set forth below, Movant expended significant efforts throughout the entire Fee Period, and at all times, endeavored to maximize the value of all assets in the Debtors' estates for the benefit of their creditors and other interested parties and to minimize the expenses incurred in connection therewith.

Most significantly, Movant was able to assist the Debtors in achieving the sale of substantially all of the Debtors' assets, consisting primarily of their interest in the Vincennes Apartments in Blue Island, Illinois (the "**Vincennes Apartments**"). In helping the Debtors negotiate and consummate the sale of their assets, Movant was able to maximize the return for the Debtors' creditors, particularly the Debtors' largest two creditors, Citibank, N.A. ("**Citibank**") and Libertyville Bank & Trust Company ("**Libertyville**").[4] Citibank ended up receiving nearly the entirety of its claim, while Libertyville received a substantial payment. Not only did Movant's efforts obviate the need for Citibank to prosecute further its pre-petition foreclosure of the Vincennes Apartments, but also the asset sale enabled these parties to receive a greater amount than if the Vincennes Apartments had sold in the distressed environment which typically accompanies a sheriff's sale.

## II.   HISTORY OF THE CHAPTER 11 CASES

1.      On August 27, 2010 (the "**Petition Date**"), the Debtors filed voluntary petitions

---

[4]While Citibank was an oversecured creditor, Libertyville's claim of approximately $4 million was undersecured, making Libertyville by far the largest unsecured creditor of the Debtors' estates.

under Chapter 11 of the Code in this District, and from and after said date continued to manage and operate their property and affairs as debtors in possession under the jurisdiction of this Court (the "**Chapter 11 Cases**")

2.      On September 2, 2010, the Court approved the joint administration of the Chapter 11 Cases, *In re LFL, Ltd.*, Case No. 10 B 38333, and *In re V & M Associates, Corporation*, Case No. 10 B 38340.

3.      The United States Trustee did not appoint a committee of unsecured creditors in the Chapter 11 Cases, nor was a trustee appointed in the Chapter 11 Cases.

4.      As set forth in several motions filed by the Debtors, the Debtors are affiliated Illinois corporations with their principal place of business located in the City of Blue Island, Illinois.  The Debtors were the one-hundred percent (100%) beneficiaries of the land trust which held title to the Vincennes Apartments.  LFL was incorporated in 1990.  V & M was incorporated the following year.

5.      The Vincennes Apartments is comprised of 314 apartment units in 24 separate "California Style" buildings built in the mid-1960s.  The unit mix consists of: studio (66), 1-bedroom (186), 2-bedroom (60), and 3-bedroom (2) apartments.

6.      The Debtors' principals are Alex Loyfman and Michael Loyfman.  Alex, the son, serves as President of LFL and V & M.  Michael, the father, serves as Vice President.  Alex and Michael managed the Vincennes Apartments through A.M. Realty Management, Inc., an affiliated non-debtor management company, by which they developed the expertise and relationships necessary to successfully market the apartment complex to prospective tenants while retaining many existing tenants long term.  Prior to sale, the Vincennes Apartments

enjoyed an occupancy rate of approximately ninety percent (90%).

7.       Prior to the commencement of the Chapter 11 Cases, the Debtors were indebted to

Citibank and Libertyville (collectively, the "**Banks**") for an amount alleged to be in excess of

$8.5 million (the "**Indebtedness**"). All Indebtedness owing from the Debtors to the Banks was

secured by and through the first- and second-priority liens which Citibank and Libertyville

asserted respectively against the Vincennes Apartments.  The Debtors and the Banks negotiated a

series of interim orders authorizing use of cash collateral, enabling property operations to

continue unabated throughout the Chapter 11 Cases.  No DIP financing was sought by the

Debtors.

8.       After extensive pre-petition marketing efforts by the Debtors, as well as post-

petition analysis of the Debtors' prospects for a successful reorganization, the Debtors engaged in

extensive negotiations with Kinzie Assets, LLC ("**Kinzie**") to serve as the stalking-horse bidder

in a proposed sale of substantially all of the Debtors' assets.  Those time-intensive negotiations

led to the execution of an Agreement of Purchase and Sale on May 2, 2011 (the "**Sale**

**Agreement**").

9.       On May 10, 2011, the Debtors filed a *Motion for the Entry of an Order Approving*

*(A) A Sale of Property Other than in the Debtors' Ordinary Course of Business, (B) The Terms of*

*Proposed Sale Agreement, (C) Bidding Procedures and a Break-Up Fee; Limiting Notice*

*Thereof; Extending the Date by which to File a Plan and Disclosure Statement and for Hearing*

*Thereon; and for Related Relief* [Docket No. 157] (the "**Sale Motion**"), seeking, *inter alia*,

authority to sell substantially all of the Debtors' assets, which included the Vincennes

Apartments and attendant personalty, consisting of equipment, appliances, fixtures, furnishings

and other operating assets (collectively, the "**Sale Property**").

10.      Under the Sale Motion, the Debtors requested authority to proceed with the

Kinzie Sale (hereinafter defined) in conjunction with the scheduling of an auction (the

"**Auction**") and the approval of related bidding procedures.  The Debtors further requested

authority to designate Kinzie as the stalking-horse bidder pursuant to a purchase offer of

$7,000,000.00 subject to adjustments for certain credits and other customary prorations (the

"**Purchase Price**"), as set forth in the Sale Agreement.

11.      The Court conducted an initial hearing on the Sale Motion on May 19, 2011, and

entered an *Order Approving Bidding, Break-Up Fee and Sale Procedures, Limiting Notice*

*Thereof, Extending the Date by which to File a Plan and Disclosure Statement and for Hearing*

*Thereon, and Authorizing Related Relief* [Docket No. 160] (the "**Bidding Procedures Order**").

The Sale Motion was thereafter continued to June 14, 2011 (the "**Sale Hearing**"), pending the

outcome of the Auction.

12.      Following the Auction on June 8, 2011, at which Kinzie was the only bidder for

the Sale Property, the Court entered an *Order Authorizing Sale of Assets Outside the Ordinary*

*Course of Business Free and Clear of Liens, Claim and Encumbrances* on June 14, 2011 [Docket

No. 181] (the "**Sale Order**"). Pursuant to the Sale Order, the Court approved the sale of the Sale

Property to Kinzie as set forth in the Sale Agreement (the "**Kinzie Sale**").

13.      Pursuant to the Sale Agreement and that certain Side Letter Agreement dated May

2, 2011, closing on the Kinzie Sale occurred on July 29, 2011 (the "**Closing**").

14.      Between entry of the Sale Order on June 14 and the Closing on July 29, the

Debtors had to address numerous pre-Closing requirements under the Sale Agreement, including

but not limited to: (i) providing Kinzie with numerous updated financial disclosures; (ii) securing

orders to reject and to assume and assign executory contracts and unexpired leases; (iii) obtaining

the necessary compliance certificates from the City of Blue Island; (iv) preparing all necessary

closing documents; and (v) taking all other steps required to transition the Vincennes Apartments

to Kinzie.  As more fully discussed below, the negotiation and ultimate closing of the Kinzie Sale

proved to be a daunting task that was both time-intensive and beset with challenges.

     15.     In accordance with Paragraph 7 of the Sale Order, at Closing, the following

disbursements, among others, were made to the Debtors' creditors and other parties in interest

(collectively, the "**Sale Proceeds**"):

(i)     Title charges, closing costs, credits, escrow payments and real estate taxes to the
appropriate parties;

(ii)     $5,058,080.23 to Citibank, the first-priority secured lender, as payment in full of
Citibank's secured claim;

(iii)     $13,000 to the United States Trustee, as payment in full of anticipated third-
quarter fees under 28 U.S.C. § 1930(a)(6);

(iv)     $100,000 to Movant's client-fund account, to be paid to Movant for services
rendered during the course of the Chapter 11 Cases, including but not limited to
the negotiation and completion of the Kinzie Sale, subject to allowance of such
fees and expenses by this Court; and

(v)     the balance of Sale Proceeds to Libertyville.

## III.   LEGAL SERVICES RENDERED BY MOVANT

     16.     For ease of reference, Movant has identified and set forth three (3) categories of

legal services rendered during the Fee Period.[5]  Each category contains a narrative with detailed

time records in chronological order, each attorney's time described therein, the nature and

purpose of such entries, and an explanation of the result achieved or benefit to the estates, as

required by In re Wildman, 72 B.R. 700 (Bankr. N.D. Ill. 1987); In re Pettibone Corp., 74 B.R.

293 (Bankr. N.D. Ill. 1987); and Steinlauf v. Continental Illinois Corp. (In re Continental Illinois

Securities Litigation), 962 F.2d 566 (7th Cir. 1992).

| DESCRIPTION | HOURS | TIME VALUE |
|---|---|---|
| A.  Administrative Matters | 180.20 | $48,383.00 |
| B.  Cash Collateral | 129.70 | $36,212.50 |
| C.  Asset Sales | 484.70 | $144,681.50 |
| TOTAL | 794.60 | $229,277.00 |

A.    **Administrative Matters**

Services Rendered:

| ATTORNEY | RATE/HOUR | HOURS | TIME VALUE |
|---|---|---|---|
| HLA | $425 | 3.60 | $1,530.00 |
| APS | $365 | 1.80 | $657.00 |
| ESB | $265 | 173.90 | $46,083.50 |
| Paralegal | $125 | 0.90 | $112.50 |
| TOTAL | | 180.20 | $48,383.00[6] |

---

[5]Given that the aggregate amount of fees and expenses incurred during the Fee Period are far in excess of the fees and expenses for which the Movant now seeks payment, the Movant has voluntarily excluded all fees and expenses generated in the preparation of this Motion.

[6]Although Movant has expended a total of 180.20 hours on Administrative Matters, for a total of $48,383.00 in fees, Movant has voluntarily reduced from that total $795.00 in fees, or 3.00 hours of time, expended by Mr. Buck in preparing the interim compensation procedures motion.

17.    Movant has expended approximately 180.20 hours during the Fee Period in connection with advising the Debtors as to the performance of their duties under Section 1107 of the Code and in confronting the numerous administrative and related matters arising herein.  See **Exhibit 1** attached hereto and made a part hereof.

18.    These matters included the conventional array of services that are required to be furnished on behalf of a debtor in possession in Chapter 11 as well as many other matters that arose due to facts and circumstances particular to the Chapter 11 Cases and the operation of a large-scale residential development.  Movant's efforts included, without limitation, the following:

(i)    Reviewing, revising and filing numerous first-day motions, including motions relating to use of cash management, joint administration, and adequate assurance of payment to utilities.  Movant also expended significant time addressing questions or concerns related thereto from various parties in interest, including creditors, utility companies and the U.S. Trustee's office;

(ii)    Discussing and/or meeting with the Debtors in preparation for the first-day hearings, as well as an ongoing review, research and analysis, relative to the anticipated response(s) thereto of the Banks;

(iii)    Preparing and filing of a motion to extend the deadline for filing bankruptcy schedules and statements of financial affairs (SOFAs), and extensive preparation and filing of two sets of bankruptcy schedules and SOFAs, one for each of the Debtors.  In preparing the schedules and SOFAs, Movant underwent a lengthy review of a multitude of records and documents, including tax returns and other

financial information, and participated in numerous meetings and conversations

with the Debtors in order to assist in accurately reflecting their assets, liabilities

and financial condition.  In addition, Movant determined the schedules were in

need of further refinement, which led to the drafting and filing of amendments,

including the addition of over 300 tenants as schedule F creditors of the Debtors'

estates;

(iv)     Discussing the Debtors' obligations under the Chapter 11 Cases with the U.S.

Trustee's office, including but not limited to proof of insurance, quarterly fee

statements and monthly operating reports.  Movant, as it typically does in all

Chapter 11 cases, also sought to be proactive with the office of the U.S. Trustee.

Movant contacted the attorney from the U.S. Trustee's office assigned to the

Chapter 11 Cases prior to the filing of many of the Debtors' motions to discuss

the nature and purpose of these motions and to obtain the input of the U.S.

Trustee's office.  Movant routinely provided the U.S. Trustee's office with

updates on matters arising in the Chapter 11 Cases;

(v)      Working with the Debtors to ensure the timely filing and dissemination of the

debtor-in-possession operating reports.  Movant also reviewed at length with the

Debtors the U.S. Trustee's Operating Instructions to make sure that the Debtors

were aware of their obligations thereunder and assisted the Debtors in complying

with same.  Movant discussed with the Debtors the calculation of the U.S.

Trustee's quarterly fees and followed up with the Debtors to ensure the prompt

payment thereof;

(vi)    Preparing a motion on behalf of the Debtors to retain Movant as counsel;

(vii)    Preparing the Debtors for and attending the initial interview with the U.S. Trustee's office;

(viii)    Preparing the Debtors for and attending the first meeting of creditors;

(ix)    Preparing a motion to retain special counsel for prosecution of eviction actions against delinquent tenants of the Vincennes Apartments, and researching Code requirements regarding same.  Movant also had to confer with the Banks in order to obtain approval of the Debtors' use of cash collateral to fund the expenditure;

(x)    Preparing a motion to retain special counsel for 2009 property-tax appeals for the Vincennes Apartments, and researching Code requirements regarding the terms of compensation therefor.  Movant also had to confer with the Banks in order to obtain approval of the Debtors' use of cash collateral to fund the expenditure. Despite an objection by the U.S. Trustee's office, Movant successfully argued in favor of a contingent payment to special counsel of no more than $5,000 which, given the small size of the expenditure by the Debtors involved, would not require preparation of an additional application for compensation, thereby preserving estate assets.  Special counsel's tax appeal resulted in property tax savings of approximately $77,188, resulting in a net benefit of approximately $72,188 to the Debtors' estates;

(xi)    Preparing a motion to establish interim compensation procedures for the Chapter 11 Cases;

(xii)    Advising the Debtors of their rights, duties and obligations under the Code, and

assisting the Debtors in establishing procedures for the Debtors to utilize in

connection with same;

(xiii)   Promptly responding to numerous inquiries of creditors and other parties in the

Chapter 11 Cases questioning the causes for the Chapter 11 filings, the impact on

their claims, the status of the Vincennes Apartments, and additional requests for

information;

(xiv)   Engaging in numerous discussions with defense counsel to the Debtors and

Debtors' president in a state-court personal-injury action, and consideration of

plaintiff's lift-stay motion to proceed with the same during the Chapter 11 Cases;

(xv)   Negotiating with counsel to the City of Blue Island regarding the Debtors'

mistaken overpayment of certain water bills.  Movant was able to secure a credit

for future invoices based on the overpayment and prepared a settlement letter

acknowledged by the City to that effect.  Movant had similar discussions with

respective counsel to ComEd and Nicor, ultimately resolving that no

overpayments occurred with respect to those utilities;

(xvi)   Preparing for and attending hearings on all motions filed in the Chapter 11 Cases;

and

(xvii)  Participating in ongoing conferences and preparing correspondence to respective

counsel for the Banks and/or to the office of the U.S. Trustee with respect to all of

the foregoing.

19.    Movant also endeavored to coordinate an agreed 2004 examination with

Libertyville.  Movant carefully worked with Libertyville to delineate the scope of the proposed

examination.  Additionally, Movant assisted the Debtors with preparation of detailed responses

and objections to Libertyville's numerous and lengthy document requests.  Movant spent many

hours organizing document production with the Debtors, followed by a thorough review of all

documents prior to turnover to ensure they were both relevant and not subject to privilege.

Movant prepared the Debtors' president for and attended the 4 ½-hour long 2004 examination,

and as a show of cooperation with Libertyville, Movant coordinated the Debtors' post-

examination turnover of certain additional materials arguably outside the scope of the 2004 exam

in order to fully address the bank's questions regarding the Debtors' financial condition.

20.     The foregoing list and description of services rendered in the administrative

category is not intended to be exhaustive, but is merely illustrative of the range of services

performed in this category.  Movant's efforts enabled the Debtors to oversee the progress of the

Chapter 11 Cases, and to properly carry out the functions designated to them under the Code.

**B.**     <u>**Cash Collateral**</u>

Services Rendered:

| ATTORNEY | RATE/HOUR | HOURS | TIME VALUE |
|---|---|---|---|
| HLA | $425 | 11.00 | $4,675.00 |
| BAB | $395 | 0.40 | $158.00 |
| APS | $365 | 0.30 | $109.50 |
| ESB | $265 | 118.00 | $31,270.00 |
| TOTAL | | 129.70 | $36,212.50 |

21.     Movant expended approximately 129.70 hours during the Fee Period in

connection with the negotiation and continued use of cash collateral during the Chapter 11 Cases.

See **Exhibit 2** attached hereto and made a part hereof.

22.     Prior to the Petition Date, the Debtors had explored potential debtor-in-possession financing options and had determined that no such alternative was available.  Moreover, following discussions about financing options with Libertyville, it became clear that at best the Debtors would be able to reach an accord on use of the Banks' cash collateral.

23.     After analyzing the Debtors' monthly cash flow from operation of the Vincennes Apartments, Movant and the Debtors determined that the Debtors would be able to survive on cash collateral, though for the sake of any reorganization, additional financing would eventually be required.  Movant was further concerned that the Debtors and Movant would be unable to work out an agreement with one or both of the Banks as to the nature and extent of adequate protection for use of the cash collateral.

24.     Movant's initial efforts in securing the Debtors' right to use cash collateral with respect to Citibank involved researching under what circumstances and parameters an equity cushion can be deemed to constitute adequate protection.  As pertaining to Libertyville, given its status as the junior secured creditor with no equity cushion believed to be available, the Debtors and Movant instead determined that a monthly provisional interest payment at the non-default rate was an appropriate measure of adequate protection.

25.     As of the date of filing of the operative motion, however, neither Libertyville nor Citibank would commit to supporting the Debtors' request for use of cash collateral. Accordingly, Movant prepared for an anticipated contested hearing on the initial request for authority to use cash collateral.

26.     At the same time, the Debtors and Movant determined that the costs and risks of

engaging in a protracted cash collateral fight – particularly where it was contemplated that the

Banks' cooperation in the Chapter 11 Cases would be beneficial – necessitated reaching

agreement on the terms of cash collateral use.  Moreover, the Debtors and Movant sought to

avoid the potentially high costs of an evidentiary hearing predicated on expert valuation of the

Vincennes Apartments.  As a result, after protracted discussions, the Debtors, Citibank and

Libertyville were able to present to the Court at the first-day hearing a proposed agreed cash

collateral order, one that Movant was careful to keep free of any provisions disfavored under

Local Rule 4001-2.  In accordance with the first interim cash collateral order, the Debtors would

provide each bank with a monthly adequate-protection payment representing provisional interest

at the non-default rate on the Indebtedness.  The size of the monthly payments also insured that

the Debtors were still able to meet their customary monthly operating expenses.

27.      As with the initial agreed cash collateral order, Movant's subsequent efforts in

securing interim cash collateral orders by agreement with the Banks often involved intense

negotiations as to the terms of use of cash collateral, as well as ongoing consultation with the

Debtors and the Banks on the figures appearing on the accompanying monthly budgets.

28.      Negotiations with Libertyville on the use of cash collateral became particularly

demanding; the bank and its counsel required detailed explanations of line items for each and

every proposed cash collateral budget.  In fact, Movant was at one point forced to prepare and

file with the Court a motion to amend the second interim cash collateral order (the "**Motion to

Amend**") in anticipation of a contested hearing over certain expenditures.  The Motion to Amend

became necessary due to Libertyville's unwillingness to allow the Debtors to use $8,000 of

additional available cash collateral for the limited purpose of paying certain wages and

management fees. On the eve of hearing on the Motion to Amend, however, Movant was able to

resolve with Libertyville the use of the additional cash, thereby again avoiding a potentially

costly evidentiary dispute in Court.

29.     While for several subsequent months, Movant was able to secure the Banks'

cooperation on use of cash collateral, by early 2011, Citibank began pressing the Debtors to

solidify an exit strategy for the Chapter 11 Cases. Moreover, the Debtors had the added burden

of trying to allocate a certain amount of cash collateral each month for payment of 2010 property

taxes on the Vincennes Apartments that would become due during the Chapter 11 Cases, as

Citibank refused to continue to pay property taxes on a post-petition basis.

30.     The Debtors' eventual decision to move forward with a proposed sale to Kinzie

alleviated some of the pressure from Citibank, but led to further scrutiny by Libertyville of the

attendant sale costs. As a result, Movant spent a great deal of time during the sale process not

only addressing the various concerns of Kinzie and Libertyville regarding the terms and logistics

of the sale itself, but also conferring with and explaining to counsel for Libertyville the need for

inclusion of various monthly expenditures in the cash collateral budgets, particularly those

related to the sale process.

31.     Ultimately, over the eleven-month period between the Petition Date and the

Closing, Movant successfully navigated a consensual path for the Debtors' use of cash collateral

and correspondingly sidestepped the spate of contested hearings that loomed in the event of a

stalemate with the Banks.

C.    **Asset Sales**

Services Rendered:

| ATTORNEY | RATE/HOUR | HOURS | TIME VALUE |
|---|---|---|---|
| HLA | $425 | 31.80 | $13,515.00 |
| HBM | $425 | 71.90 | $30,557.50 |
| APS | $365 | 0.30 | $109.50 |
| NQR | $335 | 0.20 | $67.00 |
| ESB | $265 | 376.70 | $99,825.50 |
| RDR | $235 | 1.20 | $282.00 |
| Paralegal | $125 | 2.60 | $325.00 |
| TOTAL | | 484.70 | $144,681.50 |

32.    Movant expended approximately 484.70 hours during the Fee Period in connection with (1) the solicitation of and negotiation with prospective buyers, (2) the negotiation of an asset purchase agreement with the stalking-horse bidder, Kinzie, (3) the negotiation, formulation and implementation of a Court–approved bidding and auction process, (4) the preparation, negotiation and entry of the Sale Order, and (6) the consummation of the Closing. See **Exhibit 3** attached hereto and made a part hereof. The complexities and scope of the issues attendant to the Closing required a substantial contribution of time from Mr. Merens and the almost complete attention of Mr. Buck during the months of May through July 2011.

33.    As will hereinafter be discussed, Movant faced an enormous challenge in seeking to complete the Kinzie Sale under the constraints imposed by the various parties and the underlying circumstances surrounding this transaction. In the end, and notwithstanding various obstacles and tense negotiations, Movant was successful in achieving the Kinzie Sale. As noted,

the Kinzie Sale generated: (1) a payment of $5,058,080.23 to Citibank, the first-priority secured

creditor, in full satisfaction of its secured claim resulting in the dismissal of Citibank's

foreclosure action against the Debtors and their guarantors; (2) payment of over $868,000 to

Libertyville; (3) payoff of over $117,000 in outstanding 2010 real estate taxes attributable to the

Vincennes Apartments; (4) payment of $13,000 in quarterly fees to the U.S. Trustee's office; and

(5) allocation of $100,000 for allowed fees and expenses of Movant. The Kinzie Sale also led to

the assignment of all tenant leases, including all rights and obligations thereunder, to Kinzie, and

the accompanying seamless transition in the operations of the Vincennes Apartments upon

completion of the sale.

34.    While Movant's efforts were greatly complicated by the often differing and

competing interests of Libertyville, Citibank and Kinzie, another barrier to advancing the sale

process was the fact that only the Debtors' president, Alex Loyfman, was available to address

most of the logistical issues surrounding a potential sale. In the absence of other available

personnel, Movant was required to expend a great deal of time and energy assisting Mr. Loyfman

in the completion of numerous checklist items without which the Closing would not have

occurred.

Initial Sale Efforts

35.    As of the Petition Date, the Debtors and their sale broker(s) had been unsuccessful

in locating a purchaser. Once the Debtors filed the Chapter 11 Cases, they continued to explore

the prospects for a going-concern sale. Movant kept abreast of the Debtors' efforts in this regard,

and fielded related inquiries concerning the impact of the Chapter 11 Cases on the marketing

process.

18

36.    During Fall 2010, a potential buyer surfaced.  Movant engaged in protracted
discussions with counsel for the prospective buyer and Libertyville over the potential sale terms
and necessary due diligence.  Movant assisted the Debtors in providing all necessary disclosures
in response to numerous due-diligence inquiries.  Movant also negotiated the terms of an asset
purchase agreement and commenced preparation of draft sale pleadings.  In the course of the
negotiations, the interests of the buyer and Libertyville often diverged which elongated the
negotiating process.  The prospective buyer eventually bowed out prior to the execution of an
asset purchase agreement.  Nonetheless, the manner in which the negotiations unfolded provided
useful insight that Movant devoted to the subsequent round of negotiations with Kinzie.

Sale Negotiations with Kinzie

37.    Following these initial sale efforts, Kinzie contacted Movant in November 2010,
and expressed interest in pursuing the acquisition of the Vincennes Apartments.  By December
2010, Kinzie was heavily invested in the due diligence process.  Movant assisted the Debtors in
responding to numerous inquiries from Kinzie personnel and arranged for the disclosure of the
Debtors' records and other relevant information; Movant also coordinated numerous on-site
inspections.  After an intensive two-month due-diligence period, Movant initiated negotiations
with Kinzie and Libertyville over the provisions of a Term Sheet, all the while keeping Citibank
informed of pertinent developments.

38.    The Debtors, with the approval of Libertyville, ultimately reached agreement on a
Term Sheet with a gross purchase price of $7,000,000.  The Debtors and Movant determined that
it was in the best interests of the Debtors' estates and their creditors to accept the Purchase Price
and move forward with the potential sale of their assets to Kinzie.

39.     After the parties reached agreement on a Term Sheet in February 2011, Movant

began negotiating with respective counsel for Kinzie and Libertyville over the much more

detailed provisions of the eventual Sale Agreement.

40.     Given that both Kinzie and Libertyville were represented by counsel that strongly

advocated for their clients' often-divergent interests, negotiations were painstaking and

protracted.  In particular, the parties spent considerable time flushing out the parameters of the

protections to be afforded Kinzie as the stalking horse, including the break-up fee, upset price,

and the terms under which Kinzie could be bound as runner-up to a competing bidder.  Movant

also had to contend with negotiating certain provisions unique to the Sale Property.  For instance,

Kinzie insisted that as a condition to Closing, the Debtors retain an environmental consultant to

determine if any remediation work would be required in order to secure a "No Further Action"

letter from the Illinois Environmental Protection Agency.  To that end, the parties addressed the

scope of and schedule for the consultant inspection, as well as the establishment of an escrow

agreement in the event that post-Closing remediation work would be required in order to secure

the IEPA letter.

41.     As talks dragged on, Kinzie threatened several times to suspend or even terminate

negotiations, with Movant working furiously to keep everyone on board; these efforts led to

several eleventh-hour extensions of the Kinzie-imposed deadline for executing an agreement.

42.     Further complicating negotiations was Libertyville's insistence that the Debtors

negotiate a discounted payoff figure for Citibank.  Movant therefore prepared a detailed

settlement proposal, which Movant supplemented with extensive research disputing Citibank's

asserted right to certain expenses under Section 506(b) of the Code.  As a result of those

discussions, Movant secured from Citibank an agreed discount of almost $200,000 on its claim

subject to consummation of the Kinzie Sale.

43.   Finally, after three months of negotiations – punctuated by numerous instances

where Kinzie was on the brink of walking away – the parties were able to execute the Sale

Agreement on May 2, 2011.

The Bidding Procedures, Auction and Sale Order

44.   Following the execution of the Sale Agreement, Movant commenced the process

of drafting and negotiating the provisions of the Sale Motion with these same well-represented

parties.  After finally coming to an agreement on the terms of the Sale Motion, the Bidding

Procedures Order and the Sale Notice, the parties appeared before this Court on May 19, 2011 on

the initial hearing on the Sale Motion.  At that hearing, the Court ruled that, Kinzie's misgivings

notwithstanding, notice of the proposed sale must go out to all creditors, including tenants of the

Vincennes Apartments.  Despite concerns by Kinzie about moving forward with the sale under

such conditions, Movant was able to work with Kinzie's and the U.S. Trustee's respective

counsel to craft a cover letter to tenants that, along with the approved Sale Notice, would satisfy

the Court's concerns about adequate notice.

45.   In addition to resolution of the tenant-notice issue, Movant also coordinated the

advertising of the proposed Auction and Sale Hearing in the Chicago Tribune and fielded calls

from interested parties with questions regarding the assets subject to sale.

46.   Although the Debtors did not receive any competing bids before the June 1, 2011

bid deadline, in order to ensure that the sale comported with the terms of the Bidding Procedures

Order, Movant made arrangements for the Auction to proceed.  On June 8, 2011, Movant

21

conducted the Auction, which Kinzie and Libertyville attended and at which Kinzie's bid was

confirmed on the record as the highest and best offer for the Sale Property.

47.     Movant then engaged in a series of discussions with respective counsel for Kinzie

and Libertyville (with further feedback from Citibank) over the terms of the Sale Order.  As with

the Sale Agreement and Bidding Procedures Order, Movant had to take into account concerns of

these other parties, while also ensuring that the proposed order comported with applicable

requirements under Section 363 of the Code.  Movant also insured that the U.S. Trustee's office

was kept abreast of and participated in these discussions; Movant addressed the specific concerns

of the U.S. Trustee's counsel with respect to certain provisions of the order, including the

injunctive measures Kinzie sought to insert.  Movant engaged in intense colloquy with both

counsel for Kinzie and the U.S. Trustee in an effort to reach a mutually acceptable sale order.

Ultimately, the Court weighed in at the Sale Hearing, essentially overriding any lingering

objections that Kinzie had to the Sale Order.

Pre-Closing Hurdles

48.     Under the terms of the Sale Agreement, the Debtors had to satisfy numerous

conditions to Closing.  Movant and the Debtors were also subject to the constraints of having to

comply with an outside Closing date of July 29, 2011.

49.     Kinzie had the ongoing right to on-site inspections and turnover of updated

financials and other records.  Consequently, Movant had to assist the Debtors with coordinating

the inspections and furnishing updated financials and other records of the Debtors from the

conclusion of the Sale Hearing until just prior to the Closing.

50.     Movant also facilitated ongoing discussions between the Debtors and Kinzie

regarding unexpected balcony repair work that the Debtors needed to address as a condition to

Closing. This led to Movant having to confer with the Banks on approval of the use of cash

collateral to fund the necessary repairs.

51.     Movant was further involved in coordinating the selection of the environmental

consultant to inspect the Vincennes Apartments and generate an estimate for any necessary

remediation work, the preparation of which (as discussed above) was a condition to Closing

under the Sale Agreement. In addition to speaking with various potential consultants about the

estimate, Movant spoke with Kinzie and/or Libertyville with respect to the ultimate cost of its

preparation and the scope of remediation work that would suffice to meet the requirements of the

Sale Agreement. In conjunction therewith, Movant conferred with environmental counsel to

Libertyville to obtain clarification on the conditions precedent to securing an IEPA "No Further

Action" letter as contemplated by the Sale Agreement. Movant also discussed the initial estimate

with the consultant and, in conjunction with discussions with Libertyville's environmental

counsel, obtained a revised estimate tailored to the specific requirements of the Sale Agreement.

52.     In addition to the environmental remediation estimate, Movant also assisted the

Debtors in obtaining a survey and title commitment for the Vincennes Apartments. Movant

communicated regularly with Kinzie's counsel and Chicago Title & Trust Company ("**Chicago

Title**") to address numerous title exceptions, including but not limited to: (1) obtaining written

confirmation of release with respect to a previously unidentified mortgage on the Vincennes

Apartments; (2) procuring original tax bills for payoff at Closing; and (3) obtaining Certificates

of Compliance from the City of Blue Island (discussed in detail below).

53.     With respect to the heretofore unknown mortgage, Chicago Title's initial title

search uncovered an apparent third mortgage on the Vincennes Apartments in favor of First

Equity Bank. Given that the Debtors' principals were only vaguely familiar with the origin of

First Equity's mortgage, Movant contacted the bank directly in order to determine the current

status of the mortgage. After numerous conversations with officers at First Equity Bank,

including the bank's president, the Debtors and Movant secured written confirmation from First

Equity that its mortgage on the Vincennes Apartments had been satisfied in full and released in

conjunction with the Debtors' subsequent loan transaction with Libertyville.

54.     Movant also faced a pre-Closing dispute involving the U.S. Trustee's office and

Libertyville over the appropriate calculation of third-quarter fees under 28 U.S.C. § 1930(a)(6),

which were to be paid at Closing, and whether that calculation should take into account the Sale

Proceeds, none of which were to be paid directly to the Debtors. Movant was involved in

numerous discussions with both parties regarding the issue, and thoroughly researched Section

1930(a)(6) in order to reach a resolution thereof. Ultimately, the parties agreed to a calculation

of quarterly fees based on disbursements that would take into account the Sale Proceeds.

55.     Movant coordinated final meter readings with the City of Blue Island Water

Department and the establishment of new utility accounts for the Vincennes Apartments with

Kinzie. Moreover, Movant was enmeshed in daily discussions with the City of Blue Island

Buildings Department and the Debtors regarding the securing of Certificates of Compliance for

the Vincennes Apartments. The certificates required the conducting of inspections by the City of

all 314 units of the Vincennes Apartments and execution of "As-Is Agreements" by Kinzie. The

compliance process was particularly time-consuming, given that the Buildings Department had

rarely, if ever, dealt with the sale of an apartment complex of this magnitude.

56.     Inasmuch as the Debtors were beneficiary owners of the land trust holding title to
the Vincennes Apartments, Movant prepared the necessary documentation to effectuate a transfer
of the property from the Trust to Kinzie.  Movant prepared the requisite letter of direction and
coordinated with the Land Trustee regarding the key terms of the Trustee's deed and its
preparation.

57.     As July 29 drew near, Movant was directly involved in all matters attendant to the
Closing, the most demanding of which consisted of the refinement and completion of the closing
documents.  Among other things, Movant prepared assignments of the Debtors' general
intangibles and tenant leases, bill of sale, real estate tax transfer declarations, certificate of rep's
and warranties, non-foreign entity affidavit, form 1099, ALTA statement and GAP undertaking.
In preparing these documents, Movant was in constant communication with Chicago Title to
insure all documents complied with the title company's requirements for Closing.  Movant also
negotiated with Kinzie over the terms of the assignments and bill of sale.

58.     As part of the Closing, Kinzie was to receive a credit for all tenant security
deposits, with any funds currently held by the Debtors for that purpose to be transferred to
Libertyville.  In addition, any funds in the Debtors' operating accounts, save for a reserve to pay
outstanding July expenses, were to be transferred to Libertyville at Closing.  As such, Movant
worked with the Debtors in preparing an accounting for Libertyville, which reflected the funds
currently available, an estimate of the expenses yet to be paid as of Closing, and an estimate of
the funds to be turned over to the bank at Closing.

The Debtors' Motions to Reject and to Assume and Assign

59.     Approximately two weeks prior to the scheduled Closing, the Debtors received

confirmation from Kinzie that its financing for the sale transaction was in order. As such, and in accordance with the Sale Agreement, Movant prepared and prosecuted motions to assume and assign the tenant leases to the Vincennes Apartments, and to reject all other unexpired leases and executory contracts. The motions were scheduled for hearing on July 26, 2011, just days before the Closing.

60.     While the Court granted the Debtors' motion to assume and assign the tenant leases on July 26, the rejection process became exponentially more complicated upon an eleventh-hour objection to the rejection motion by Commercial Coin Laundry Systems ("**Commercial Coin**"), a laundry equipment vendor for the Vincennes Apartments. At the July 26 hearing, counsel to Commercial Coin requested an opportunity to file an objection to the motion to reject. Acknowledging the tight Closing deadline under which the Debtors were operating, the Court gave Commercial Coin until the end of that day to respond, the Debtors were afforded until the end of the following day to reply, with a ruling to follow on July 28, one day before Closing.

61.     At the same time that Movant was briefing the rejection motion, Movant was involved in intensive negotiations with respective counsel to Commercial Coin, Kinzie and Libertyville in an attempt to resolve the dispute with Commercial Coin prior to the July 28 hearing. Movant was unable to reach a resolution. Fortunately, the Movant was able to persuade the Court to approve the motion to reject.

62.     Notwithstanding the successful outcome, with Libertyville's prompting, Movant continued to engage in negotiations with Commercial Coin in an effort to resolve any purported rights of possession that would inure to Commercial Coin post-Closing. Those negotiations took

on greater urgency and became all-the-more difficult when Kinzie made clear that it would not agree to any postponement of the July 29 Closing date.

Consummation of the Kinzie Sale

63.     On the eve of Closing, Movant directed its efforts toward: (1) finalizing the numerous closing documents; (2) reviewing the list of deliverables for turnover to Kinzie at Closing and coordinating their ultimate delivery; (3) engaging in ongoing discussions with respective counsel for Commercial Coin, Kinzie and Libertyville; (4) conferring with Chicago Title Land Trust Company over last-minute revisions to the Trustee's deed and other documents; (5) finalizing the accounting to Libertyville; and (6) establishing with the title company the sequence of wire transfers and escrow deposits to be effectuated as part of the Closing.

64.     Notwithstanding numerous outstanding issues arising throughout the final week before Closing, with Movant's persistence, the Debtors were able to successfully close as scheduled on July 29. This result conferred substantial benefits on the Debtors' estates and their creditors, and enabled the Debtors to achieve their objective of maximizing value while developing and implementing a viable strategy for successfully concluding the Chapter 11 Cases.

## IV.    **STANDARDS FOR REVIEW OF MOTION**

65.     The Court need look no further than Local Rule 5082-1 and the opinions in In re Pettibone Corp., 74 B.R. 293 (Bankr. N.D. Ill. 1987), and In re Wildman, 72 B.R. 700 (Bankr. N.D. Ill. 1987), for the applicable standard of review of the Motion. The court in Pettibone stated:

> Under Section 330 of the Bankruptcy Code, professionals applying for fees must demonstrate *in writing* that their services were (1) actual; (2) necessary, and (3) reasonable. Once services have been performed, Bankruptcy Rule 2016 requires that:

A person seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a *detailed* statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested. (Emphasis added)

These detailed applications establish the "actual," while an accompanying narrative explanation of the "how" and "why" establishes the "necessary."

The primary objective of any fee petition is to reveal sufficient data to enable the Court to determine whether the services rendered were reasonable, actual and necessary. In re Jensen-Farley Pictures, Inc., 47 B.R. 557 at 582 (Bankr. D. Utah 1985).

Pettibone, 74 B.R. at 301 (emphasis in original).

66.    While a bankruptcy court has wide discretion in reviewing a fee petition, such authority must be dispensed with great care and fairness, Wildman, 72 B.R. at 705, keeping in mind that the well-accepted goal is to encourage and induce capable attorneys to practice in the court, Pettibone, 74 B.R. at 306.

67.    In analyzing a fee petition, the court must determine "what the lawyer would receive if he were selling his services in the market rather than being paid by court order." In re Continental Illinois Securities Litigation, 962 F.2d 566, 568 (7th Cir. 1992) (citations omitted). Moreover, as stated in Boston and Maine Corp. v. Moore, 776 F.2d 2 (1st Cir. 1985), the court should focus on the benefits to the estate and the quality of the performance of counsel in the context of the case as a whole:

Given these circumstances, it is important for a court to maintain "a sense of overall proportion," Gabriele v. Southworth, 712 F.2d 1505, 1507 (1st Cir. 1983), and not "become enmeshed in meticulous analysis of every detailed facet of the professional representation," Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp., 540 F.2d 102, 116 (3d Cir. 1976) ("Lindy II"). It is easy to speculate in retrospect that the work could have been done in less time or with fewer

attorneys or with an associate rather than a partner.  On the other hand, it is also possible that [the debtor] would not have enjoyed the success it did had its counsel managed matters differently.  Fee-cutting "ideally should be tempered with a view towards the *need for the services at the time they were rendered*."  In re Casco, 25 B.R. at 756 (emphasis added).

Id. at 10.

68.    Movant has endeavored to prepare this Motion in accordance with the standards and guidelines outlined in Pettibone and Wildman.

**A.    Form of Motion**

69.    Itemized Daily Entries - Categories A through C in Section III above contain detailed entries listing the subject activity, the date, the time spent, the nature of the services rendered and the purpose for same.  Explanations are included to inform the reader of the circumstances giving rise to the activity.

70.    Telephone Conferences - Telephone conferences are detailed with disclosure of the topic of discussion, as well as the person called and reason therefor.  Telephone conferences are cost beneficial to the estates as they provide the most efficient way to handle the numerous matters involved.

71.    Meetings and Office Conferences - Movant spent considerable time in meetings and conferences as a means of performing the services required.  As outlined herein, Movant has been reasonable and diligent on all occasions, thereby avoiding the need for litigation that would have otherwise resulted.  Litigation of many of the legal issues involved would have unnecessarily increased administrative expenses with no assurance of a beneficial result.  Where a meeting is described, the persons present and topics discussed are set forth.

72.    Drafting - The drafting of documents, letters, emails, motions and orders is clearly

delineated.  The complexity of the matters and the numerous parties involved often dictated

many revisions.

73.     Legal Research - While the members of Movant have devoted substantially all

their professional careers to the practice of commercial law, bankruptcy, insolvency and

corporate reorganizations, legal research was essential on numerous occasions in cases of this

magnitude.  A lawyer who does not spend considerable time in the law library is doing a

disservice to his client, and will soon find out that the rapidly evolving field of bankruptcy law is

leaving him or her behind.  Indeed, the Seventh Circuit has recognized the need and requirement

for constant research and preparation by attorneys, even in their own specialized areas of

concentration.  See Continental Securities, 962 F.2d at 570 (when addressing the fee request of

securities lawyers in a class action securities lawsuit, the Court stated that "no one carries the

whole of federal securities law – not only the many detailed statutes and regulations but the

thousands of decided cases – around in his head, and a lawyer who tries to respond to a motion or

brief without conducting fresh research is courting sanctions or a malpractice suit.")

74.     Minimum Time - Movant does not apply a uniform amount of time to a particular

activity.  The time entries herein have been kept on a tenth of an hour basis.  The Court should be

sensitive, however, to the reality that bankruptcy cases do not lend themselves to meticulous time

keeping.  Oftentimes, a lawyer's need to concentrate, the press of time and the emotion and

energy involved, interfere with time keeping with exacting detail.  That was certainly the case as

the Debtors and Movant approached the date of Closing.  Great care has been utilized to keep

reasonably accurate time.  Movant asks this Court to bear in mind the "big picture" context

hereinbefore described by the First Circuit Court of Appeals in the Boston and Maine case.

75.     <u>Lumping</u> - Movant has endeavored to avoid grouping a number of unrelated activities into the same time entry.  To the extent such grouping has occurred, Movant has attempted to detail exactly how much time was spent on each activity therein.  The Court should, however, keep in mind that in a case of the size and complexity of these cases, meetings or telephone conferences will involve the discussion of numerous topics and several telephone calls may be made to a number of parties in rapid succession on one or more topic areas.  The entries elaborately describe each activity with identification of the party, the purpose of the activity and in many cases, the necessity thereof.  Such grouping is unavoidable, but the informative explanations herein serve to further describe and delineate the time spent.

**V.     BILLING JUDGMENT AND AVOIDANCE OF DUPLICATION OF SERVICES**

76.     As set forth in <u>Pettibone</u>, 74 B.R. at 303, Section 330 of the Code provides that compensation for actual and necessary services makes the exercise of billing judgment "mandatory" in bankruptcy fee petitions.  The estate should not bear the burden of duplication of efforts which should be avoided by the exercise of good billing judgment.

77.     Movant is a small firm, which by definition prevents any significant duplication of efforts.  Herein, Howard L. Adelman, Henry B. Merens and Erich S. Buck have performed the vast majority of services in connection with the representation of the Debtors.  The extensive efforts required in the Chapter 11 Cases have, of necessity, also involved other members of Movant; however, as explained in footnote 7 in Section VI below, Movant does not seek the allowance of attorneys' fees incurred during the Fee Period other than those of Messrs. Adelman, Merens and Buck.

78.    Every effort has been made to delineate specific tasks and in so doing, to prevent an unnecessary overlap in representation.  While certain matters required joint consultations, duplication has been judiciously avoided, with the bulk of services rendered only by Mr. Buck. When two attorneys were needed, they were only involved due to the great complexity of a given matter, the press of business, or if another member of the firm was handling a matter in some way connected with another activity.  So, too, as with other matters, certain interoffice conferences between partners of the firm or a partner and an associate occurred as were necessary and beneficial for the estates.  The benefit to the estates from these activities resulted in an associate being able to perform certain services which brought with it the lowered rates of the associate and also the associate's greater availability to perform such services.  It is not realistic to expect associates with limited experience in a case to operate as efficiently as a partner with greater experience not only in a given case but in the practice of law.  Accordingly, some joint participation in cases of this magnitude and activity is unavoidable.  In fact, however, such overlap ultimately resulted in a more efficient and economic expenditure of time.

79.    Practically speaking, a small firm such as Movant's does not have the luxury of having more than one attorney generally handle any particular task.  So, too, in cases with issues as complex as those presented to Movant here, at times certain problems required the collective judgment of the attorneys in the firm.  Again, however, a review of the detailed statement of services rendered by Movant in these cases reflects that duplication of services, albeit at times necessary, was kept to an absolute minimum and in fact generated cost benefits to the estates. The appropriateness of the billing judgment of Movant can best be supported by the following analysis of the factors set forth in Pettibone:

32

A.    **Individual Responsibility**

80.    A review of this Motion will show that a minimal amount of conferring occurred

in the Chapter 11 Cases.  When interoffice conferences were required, they were required only to

facilitate the coordination of effort and avoid the duplication thereof.  The Court will find few

lengthy interoffice conferences given the complexity and magnitude of the Chapter 11 Cases.

Movant has prepared this Motion to comply with the billing guidelines for office conferences as

set forth in In re Adventist Living Centers, Inc., 137 B.R. 692, 697 (Bankr. N.D. Ill. 1991).  In

conformity with Adventist Living Centers, Movant has billed only "active" attorney's time for

office conferences.  However, if the office conference constituted (i) a "status" conference,

wherein one attorney advises another as to matters pending in a case and often assigns future

work to be performed, or (ii) a "strategy" conference, wherein one or more attorneys determine

the course of action to be taken, then Movant has billed for all attorneys involved in the

conference.

B.    **Court Appearances and Meetings**

81.    In the approximately 794.60 hours reflected in this Motion, other than the hearing

on first-day motions, there are no instances where more than one attorney attended a particular

court appearance.  Telephone conferences for particular matters have generally been attended by

only one attorney.  On certain occasions, it was necessary for more than one attorney to attend a

meeting or participate in a conference call.  The use of more than one attorney was precipitated

by the fact that such meetings usually led to the delegation of several different activities, or

involved discussions concerning information that could best be gained firsthand.

C.      **Appropriate Level of Skill**

82.     Herein, Howard L. Adelman and Henry B. Merens had a significant role in the representation of the Debtors in those areas requiring the services of a more experienced practitioner.  Where appropriate, however, the legal work was handled by other members of the firm, in particular Erich S. Buck, to take advantage of lower billing rates.

D.      **Legal Research**

83.     Most, if not all, of the legal research was performed by members of the firm with lower hourly rates, in particular Mr. Buck, to further reduce the amount of fees in the Chapter 11 Cases.

E.      **Document Review**

84.     A careful review of the detailed time entries will reflect that there are very few entries for one attorney reviewing the work product of another attorney.  In the rare cases where such examination appears, it was necessary as a result of the press of time and complexity of the matter involved.  It is both necessary and expected that such complex legal work will involve a certain amount of analysis by more than one attorney.  The Court should be advised, however, that these instances are few, and at no time was such a review simply a matter of interest.  Again, pursuant to the requirements of <u>Adventist Living Centers</u>, only the active attorney's time is billed in this Motion for a document review conference.

VI.     **QUALIFICATIONS OF MOVANT; PRECLUSION OF EMPLOYMENT DUE TO ACCEPTANCE OF THE CHAPTER 11 CASES; AND COST OF COMPARABLE SERVICES**

85.     Adelman & Gettleman, Ltd. was established in 1983 and has been listed in The Martindale-Hubbell Bar Register of Preeminent Lawyers since approximately 1985. The firm is

the only Chicago bankruptcy boutique firm having its lawyers recognized in Illinois Leading

Lawyers Network, Best Lawyers in America, Woodward/White, World's Leading Lawyers by

Chambers and Partners, Legal Publishers 2002-2003, America's Leading Lawyers for Business,

Chambers and Partners, Legal Publishers 2004, The Best Attorneys Network and Illinois "Super

Lawyers."

86.     Movant has brought to bear on the issues and other matters faced by the Debtors

in the Chapter 11 Cases the collective skill and experience of the following members of Adelman

& Gettleman, Ltd:

HOWARD L. ADELMAN

Mr. Adelman is a 1977 *cum laude* graduate of St. Louis University School of Law, and is

licensed to practice in the States of Illinois and Missouri. Upon his graduation from law school,

Mr. Adelman was law clerk to the Honorable Robert G. Dowd, Chief Judge of the Missouri

Court of Appeals, St. Louis District, and later became the Executive Judicial Assistant to the

Missouri Court of Appeals, St. Louis District.

In 1978, Mr. Adelman joined the firm of Schwartz, Cooper, Kolb & Gaynor, and was

made a partner in said firm in 1981. In 1983, Mr. Adelman formed the law firm of Adelman &

Gettleman, Ltd. with Chad H. Gettleman. Since entering private practice in 1978, Mr. Adelman

has devoted his entire professional practice to areas of commercial litigation, bankruptcy,

insolvency and corporate reorganization. Mr. Adelman has participated in major bankruptcy

cases since 1978 as counsel to debtors as well as serving as counsel to creditors' committees, has

confirmed numerous plans of reorganization, and has tried and argued cases in the Bankruptcy

Court and the United States District Court.

Mr. Adelman has appeared in the Seventh Circuit Court of Appeals on numerous

occasions beginning with In re EDC Holding Company, 676 F.2d 945 (7th Cir. 1982).  Mr.

Adelman has been listed in the 1995 - 1996, 1997 - 1998, and 1999 - 2000 editions of Naifeh and

Smith's "The Best Lawyers in America", Woodward/White (1999).  In October of 1999, Mr.

Adelman was appointed by Chief Justice William Rehnquist to serve as a member of the Judicial

Conference Advisory Committee on the Federal Rules of Bankruptcy Procedure.  Mr. Adelman

was inducted as a Fellow of the American College of Bankruptcy, as part of its Twelfth Class.

HENRY B. MERENS

Henry B. Merens is a partner of Adelman & Gettleman, Ltd.  Since his admission to

practice in 1981, Mr. Merens has concentrated in the areas of bankruptcy, real estate, civil

litigation and commercial transactions, and has had extensive experience in virtually all aspects

of insolvency practice.  Mr. Merens has participated in numerous significant Chapter 11 cases, as

counsel to debtors, creditors, creditors' committees, secured lenders, trustees and other parties.

As debtor's counsel, Mr. Merens has confirmed a number of Chapter 11 plans of reorganization

and has successfully concluded multiple Chapter 11 liquidations involving going concerns sales

of various business enterprises.  Mr. Merens has had several articles published in the fields of

bankruptcy and commercial practice, and has participated as a featured speaker at a seminar

dealing with mortgage foreclosures in Illinois, speaking on the interplay of bankruptcy and the

foreclosure process.  In April 2009, Mr. Merens participated in a panel discussion sponsored by

the National Business Institute entitled "Bankruptcy Forum: What Judges And Trustees Want

You To Know."  Mr. Merens covered the segment of the discussion concerning Real Estate

Issues in Bankruptcy.  Mr. Merens has again been selected by his peers as an Illinois Super

Lawyer for 2012.  Mr. Merens earned his B.A. degree at Trinity College and his J.D. degree at

the Washington University School of Law.

ERICH S. BUCK

Mr. Buck, an associate attorney of Adelman & Gettleman, Ltd.,  joined the firm in

November 2007 and focuses his areas of practice in business bankruptcy, reorganization and

commercial litigation.  Mr. Buck is a 1997 graduate of Northwestern University and in 2001

graduated from the University of Iowa College of Law.  While attending the University of Iowa ,

Mr. Buck served as Managing Editor of the University's *Journal of Gender, Race & Justice*.

Upon graduating law school, Mr. Buck served two years as law clerk to the Honorable Carol A.

Doyle of the United States Bankruptcy Court for the Northern District of Illinois.  Prior to joining

Adelman & Gettleman, Ltd., Mr. Buck was an associate at Reed Smith LLP (formerly Sachnoff

& Weaver, Ltd.), where his practice focused primarily on creditors' rights litigation.  He has been

named a Rising Star in the Illinois Super Lawyers publication since 2009.

87.     The following is a summary of the legal services rendered by Movant[7]:

---

[7]In addition to not seeking any fees for the preparation of this Motion and agreeing to the
reduction of $795.00 in fees as explained in Section III above, Movant has further reduced by $1,383.00
the fees sought for the Fee Period, resulting in an aggregate reduction of $2,178.00.  The reduction of
$1,383.00 represents collectively 4.20 hours expended by four other attorneys at Movant's firm – Brad
A. Berish (BAB), Adam P. Silverman (APS), Nathan R. Rugg (NQR), and Rebecca D. Rosenthal (RDR).
While the 4.20 hours of services were beneficial to the Debtors' estates, Movant nonetheless has
voluntarily deducted the fees incurred in light of the size of the Chapter 11 Cases and Movant's efforts to
minimize the number of attorneys involved therewith.

91545.5 9/13/11                                   37

| ATTORNEY | RATE/HOUR | HOURS | TIME VALUE |
|---|---|---|---|
| HLA | $425 | 46.40 | $19,720.00 |
| HBM | $425 | 71.90 | $30,557.50 |
| BAB | $395 | 0.40 | $158.00 |
| APS | $365 | 2.40 | $876.00 |
| NQR | $335 | 0.20 | $67.00 |
| ESB | $265 | 668.60 | $177,179.00 |
| RDR | $235 | 1.20 | $282.00 |
| Paralegal | $125 | 3.50 | $437.50 |
| SUBTOTAL | | 794.60 | $229,277.00 |
| Less Voluntary Reduction | | (7.20) | $(2,178.00) |
| TOTAL | | 787.40 | $227,099.00 |

88.     As a result of the acceptance of employment as counsel to the Debtors in the

Chapter 11 Cases, Movant was precluded from rendering services in other substantial legal

matters.  Since the commencement of the Chapter 11 Cases, Mr. Buck in particular has spent a

significant portion of his time on matters involving the Debtors.  Moreover, since the beginning

of negotiations between the Debtors and Kinzie over the potential sale of substantially all of the

Debtors' assets, Mr. Merens has spent a significant portion of his time on matters involving the

Debtors.  The expertise of Mr. Adelman, Mr. Merens and Mr. Buck was required in light of the

complexity and challenges of the Chapter 11 Cases and the Kinzie Sale.  The hourly rates

charged by Movant are commensurate with the skill and expertise brought to bear on the duties

and responsibilities of the Debtors.  In fact, Movant has discounted its hourly rates in light of the

size of the Chapter 11 Cases; as such, the rates are likely well below those charged by other

bankruptcy practitioners of similar experience.

## VII.   MOVANT'S STATEMENT PURSUANT TO §§ 329 AND 504 OF THE CODE AND BANKRUPTCY RULE 2016

89.     Except with respect to the sharing of compensation authorized under Section 504(b) of the Code, Movant has not shared or agreed to share any award of fees received in connection with the Chapter 11 Cases with any person, firm or entity.  There does not exist any agreement or understanding between Movant, associates or employees, and any other person, firm or entity with respect to the sharing of compensation herein.

## VIII.   **NOTICE**

90.     Notice of hearing on this Motion [Docket No. 214] (the "**Notice**") has been given on at least twenty-one (21) days notice to: (a) the Office of the U.S. Trustee; (b) respective counsel to Citibank and Libertyville; (c) except for tenants of the Vincennes Apartments, all unsecured creditors of the Debtors' estates, including the 20 largest unsecured creditors; and (d) all counsel of record and other parties requesting notice in the Chapter 11 Cases.  In addition to the Notice, Movant has served the Motion on the foregoing parties.  Movant submits that such notice is adequate under the circumstances, and requests that any further notice requirement be waived and/or reduced in accordance with Bankruptcy Rules 2002(a)(6) & (c)(2) and 9006(c).[8]

---

[8]In accordance with Paragraph 7(d) of the Sale Order and Paragraph 5 of the order approving assumption and assignment of all tenant leases to the Vincennes Apartments [Docket No. 201] (the "**Assumption/Assignment Order**"), Kinzie received a credit from the Debtors at Closing for the full amount of all tenant security deposits.  By virtue of Paragraph 5 of the Assumption/Assignment Order, Paragraphs S and 15-16 of the Sale Order, and Paragraph 10.1.2 of the Sale Agreement (Exhibit "1" to the Sale Order), Kinzie assumed all liability for restoration and maintenance of the security deposits.  In light of these requirements, tenants to the Vincennes Apartments have been made whole with respect to their pre-petition claims against the Debtors' estates.  As such, and after conferring with the U.S. Trustee's office (which had no objection to the proposed limitation of notice), Movant limited notice of hearing on this Motion to all other parties in interest in the Chapter 11 Cases.

## IX.   CONCLUSION AND REQUEST FOR ALLOWANCE OF FINAL COMPENSATION AND REIMBURSEMENT OF EXPENSES

91.   For all of the foregoing reasons, in consideration of the time and labor required and performed in these cases; the novelty and difficulty of the matters herein; the skill required to properly and efficiently perform the legal services; the preclusion of employment of Movant in other matters due to the complexity of these cases during the Fee Period; the customary fees involved in comparable matters; the nature of the matters; the experience, reputation and ability of Movant; the financial commitment required during and throughout the Fee Period; and the results achieved, Movant respectfully requests that final compensation as counsel to the debtors in possession during the Fee Period in the amount of $227,099.00, and reimbursement of ordinary and necessary expenses incurred in connection therewith in the amount of $5,075.65 sought herein, be determined to be reasonable and justified, and that the fees and costs requested be allowed; and that, in accordance with the Sale Order, payment of such allowed fees and expenses be authorized and directed from $100,000.00 in funds on deposit in Movant's client-fund account maintained in these Chapter 11 Cases, as well as application of $22,591.00 representing the Remaining Prepayment; and for such other and further relief as is just. Movant therefore requests entry of an order, a proposed form of which is filed herewith, consistent with the foregoing.

Respectfully submitted,

LFL, LTD. and
V & M ASSOCIATES, CORPORATION
Debtors and Debtors in Possession

By:  /s/ Erich S. Buck
     One of Their Attorneys

HOWARD L. ADELMAN, ESQ. (ARDC# 10015458)
HENRY B. MERENS, ESQ. (ARDC# 6181695)
ERICH S. BUCK, ESQ. (ARDC# 6274635)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Blvd., Suite 1050
Chicago, Illinois 60604
(312) 435-1050
Attorneys for the Debtors